STATE OF MAINE
CUMBERLAND, SS

SUPERIOR COURT
CIVIL ACTION
DOCKET NOT RE-17-191

OLD TOWN UTILITY & TECHNOLOGY PARK, LLC, RELENTLESS CAPITAL COMPANY, LLC, and SAMUEL EAKIN,

Plaintiffs,

v.

MFGR, LLC, WILLIAM FIRESTONE, OLD TOWN HOLDINGS II, LLC, and JOSEPH EVERETT DESCHENES

Defendants.

FIRST AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, SPECIFIC PERFORMANCE, OTHER EQUITABLE RELIEF, AND OTHER RELIEF

(Title to Real Estate Involved)

**NOW COME** the Plaintiffs, Old Town Utility & Technology Park, LLC, Relentless Capital Company, LLC and Samuel Eakin, by and through their attorney, Clifford M. Ginn, Esq., and complain as follows:

## NATURE OF THE ACTION

1. This action is brought by Old Town Utility & Technology Park, LLC ("OTU"), a Maine limited liability company, Relentless Capital Company, LLC ("Relentless"), a Maine limited liability company that is OTU's sole member, and Samuel Eakin, Manager for both entities, alleging that Defendant MFGR, LLC, breached its agreement to sell the Expera Mill Facility to OTU, as well as its agreement to pay certain commissions to OTU, in order to permit a sale to a higher-paying buyer who would restrain trade in the forest products industry, in violation of state and federal antitrust laws, and tortiously interfered with the Plaintiffs' business opportunity to participate in implementation of an Energy Services bid for the University of Maine (the

"University"). Plaintiffs hereby seek compensatory damages, specific performance, injunctive and declaratory relief, and other legal and equitable relief.

**PARTIES**

2. Plaintiff OTU is a Maine limited liability company, formed on December 11, 2015, with principal place of business in Cape Elizabeth, Cumberland County, Maine. Plaintiff Relentless is a Maine limited liability company with principal place of business in Cape Elizabeth, Cumberland County, Maine. Plaintiff Eakin resides in Cape Elizabeth, Cumberland County, Maine, and is Managing Partner of OTU and Managing Director of Relentless.

3. On information and belief, defendant MFGR, LLC ("MFGR") is a Delaware limited liability company with principal place of business in Enfield, Hartford County, Connecticut, and its members are: Capital Recovery Group, LLC ("CRG," or an affiliate thereof), a Delaware limited liability company with principal place of business in Enfield, Hartford County, Connecticut; Gordon Brothers Group, LLC ("Gordon," or an affiliate thereof), a Delaware limited liability company with principal place of business in Boston, Suffolk County, Massachusetts; Rabin Worldwide, Inc. ("Rabin," or an affiliate thereof), a California corporation with principal place of business in Mill Valley, Marin County, California; and PPL Group, LLC ("PPL," or an affiliate thereof), an Illinois limited liability company with principal place of business in Northbrook, Cook County, Illinois. On information and belief, defendant William Firestone ("Firestone"), is a resident of Enfield, Hartford County, Connecticut, and is a principal of CRG and MFGR. On information and belief, Defendant Old Town Holdings II, LLC ("OTH") is a Maine limited liability company with principal place of business in Old Town, Penobscot

County, Maine, and its sole member and manager is Defendant Joseph Everett Deschenes ("Deschenes," who goes by "Everett"), a resident of Milford, Penobscot County, Maine.

## GENERAL ALLEGATIONS

### THE EXPERA MILL

4. The Expera Mill Facility (the "Facility") includes approximately 300 acres of land, with 4,000 feet of frontage on the Penobscot River, roughly 400,000 square feet of warehouse building, a waste water treatment plant, a 16 MW biomass boiler, additional power generation assets (including buildings, boilers, turbine and water intake), process buildings and parts, and wood yard assets. The Facility is described in Penobscot County Registry of Deeds Book 14066, Page 68.

5. On or about January 27, 2016, MFGR purchased the Facility from Expera Old Town, LLC, a Delaware limited liability company with principal place of business in Old Town, Penobscot County, Maine.

### FORMATION OF OTU, INITIAL NEGOTIATION OF FACILITY PURCHASE

6. On or about December 15, 2015, Relentless, acting through Eakin, and James W. Sewall Company ("Sewall," a Maine corporation with principal place of business in Old Town, Penobscot County, Maine), acting through President and CEO David Edson ("Edson"), formed OTU for the purpose of acquiring (or leasing) and redeveloping the Facility. OTU sought to combine Sewall's natural resources expertise, supply chain relationships and local relationships with Relentless's expertise and contacts in corporate restructuring and project finance in pursuit of those goals.

7. Sewall and Relentless later brought Everett Deschenes ("Deschenes"), the former Manager of Fiber and Logistics at the Facility, into their efforts, and made Deschenes's company, Old Town Holdings II LLC ("OTH"), a single-member Maine limited liability company with principal place of business in Old Town, Penobscot County, Maine, a member of OTU. As of July 15, 2016, when the three members executed an operating agreement for OTU, the three members had equal, one-third ownership interests in OTU, and Edson, Eakin and Deschenes were its managers. The operating agreement expressly confirmed the Managers' duty of loyalty to the LLC, duty not to exploit a business opportunity without first disclosing and offering it to the LLC, and duty of confidentiality. The Operating Agreement permitted a Member to dissociate on at least thirty (30) days written notice to the other Members.

8. Eakin and Edson agreed that the Facility could finance redevelopment, operate sustainably and maximize job creation by combining restart of pulp operations with biofuels development and long-term contracts for steam and power with the University, supplied by the Facility's energy assets.

9. In December, 2015, OTU began discussions with MFGR about purchasing the Facility, discussing dollar amounts, deal structures and financing avenues that would ultimately be reflected in offer letters and later a contract for purchase, described below.

10. In January 2015, OTU began discussions with the City of Old Town (the "City") about purchase of the Facility. Bill Mayo ("Mayo") the City's City Manager, invited OTU to brief the Old Town City Council on discussions to date in executive session at a February 2, 2016 City Council meeting. Several other City Council briefings took place in executive sessions in pursuit of the project.

11. On February 9, Eakin sent an email to Firestone, principal for MFGR and CRG, discussing dollar amounts, deal structures and financing avenues that would ultimately be reflected in offer letters and later a contract for purchase, described below.

12. On February 26, 2016, Eakin emailed Firestone a target schedule of payments for acquisition of the Facility, with $5,000,000 payable in 2016 and $4,000,000 in additional net payments over the ensuing four years. This structure closely resembled the structure that would be proposed in offer letters and later a contract for purchase, described below. Edson sent Firestone a similar email on February 29, 2016.

13. On February 29, 2016, Edson emailed Eakin, indicating that Mayo expected to get authorization on March 7 to spend money auditing data supplied by Firestone. Edson estimated that the reporting loop would be completed in two months.

INITIATION OF UNIVERSITY OF MAINE ENERGY REQUEST FOR PROPOSALS

14. In January 2016, Edson and Eakin met with Chip Gavin, the University of Maine System Chief Facilities and General Services Officer, to present their concept for redevelopment and sustainable operation of the Facility, development of biofuels operations, and long-term contracts for steam and power with the University, supplied by the Facility's energy assets. Gavin immediately cut the conversation short, stating that the University could only entertain such an idea in conjunction with an energy services Request for Proposals and public bidding process.

15. On or about February 14, 2016, the University of Maine (the "University") posted a Request for Proposals – "Strategic Sourcing Initiative: University of Maine Energy Solutions," RFP #2016-43 (the "RFP"), seeking a long-term agreement with an

awardee to implement energy solutions that met the University's goals for climate commitment, minimized cost, predictable and stable costs, and improved reliability. Relentless and Sewall agreed to develop and spearhead a response to the RFP that incorporated the Mill Facility.

16. Relentless recruited power generation engineering firm Self-Gen to collaborate on developing a response to the RFP that utilized the Facility's assets, and Self-Gen in turn recruited Consolidated Edison Solutions ("ConEd Solutions") to join the team as lead – specifically to act in the role of an Engineering, Procurement and Construction contractor, whereby Self-Gen would act as a subcontractor for engineering and Relentless/Sewall (OTU) would acquire, finance and develop the Facility, subject in part to the terms of the University award. The Phase I response included ConEd Solutions, Relentless, Sewall and Self-Gen as partners.

17. On March 4, 2016, Relentless executed a Teaming Agreement ("Teaming Agreement") with ConEd Solutions, which governed their mutual efforts to secure the RFP, specified Relentless's responsibilities, and prohibited ConEd from utilizing the services of any other party in performing those responsibilities. Pursuant to the Teaming Agreement, if ConEd Solutions won the bid, it would subcontract with Relentless for the responsibilities prescribed therein. Both Relentless and Sewall were obligated to consolidate their activities into OTU.

18. In Phase I of the RFP, sixteen respondents submitted qualifications and a non-binding scope of work for a conceptual solution for the University's supply-side energy needs.

19. The University ultimately selected four respondents to participate in Phase II of the RFP, wherein each prepared a Project Concept for University review. Phase II proposals could receive up to 50 points for Project Concept, 25 points for Experience, 15 points for Financial Stability, and 10 points for Maine Economic Impact.

AGREEMENT TO PROVIDE SERVICES AND COMPENSATION SCHEDULE

20. In March 2016, MFGR and OTU executed an Agreement To Provide Services and Compensation Schedule (the "Advisory Agreement," Exhibit A), pursuant to which OTU would facilitate sale of the Facility's wastewater treatment plan and warehouses. It reduced to writing a January agreement between MFGR and OTU.

21. The Advisory Agreement contained the following terms.

a. OTU would facilitate the sale of the Facility's wastewater treatment plant for $3,000,000 and the warehouse for $1,000,000 to either the City or a new prospect.

b. With regard to the treatment plant, MFGR would pay OTU 10% of net closing proceeds at sale, plus reimbursement of up to $25,000 of OTU's out-of-pocket expenses, so long as the plant went under contract within 60 calendar days of the Effective Date (the "Contract Deadline"), and the closing occurred within 90 calendar days of the Effective Date or on such later date to which MFGR and the buyer agreed (the "Closing Deadline").

c. With regard to the warehouse, MFGR would pay OTU 10% of net closing proceeds at sale, so long as the warehouse went under contract within 30 calendar days of the Effective Date (the "Contract Deadline"), and the closing

occurred on April 30, 2016 or on such later date to which MFGR and the buyer agreed (the "Closing Deadline").

d. MFGR agreed not to retain any other person or entity to provide the services OTU was providing.

e. MFGR represented, warranted and covenanted that it desired to sell the two assets in the manner contemplated in the agreement, that it would act in good faith in its course of dealing with OTU, and that it would not, by action or inaction, evade its obligation to pay OTU's fees and expenses.

DEVELOPMENT OF FRAMEWORK FOR PURCHASE AGREEMENT

22. In March 2016, OTU, acting through Eakin, and MFGR, acting through Firestone, negotiated a framework for a phased purchase of the Facility by some combination of OTU and the City, dividing the Facility into bundles of assets that would be financed and sold separately in phases.

23. In April, the City agreed to provide financing of $3,000,000 toward purchase of the Facility, and participated in negotiations to do so, with OTU as the City's representative and partner.

24. On April 11, 2016, Edson sent an email to Mayo and Eakin, laying out the agreed structure for the joint acquisition of the Facility by the City and OTU. It read as follows.

> The Old Town Mill cannot be owned by the City and receive financing from FAME.
>
> To overcome this Old Town Utility & Technology Park, LLC (OTUTP) will own those assets for the purpose of closing the transaction. It is reasonable to expect that (a) land assets would be contributed to the city at

a later date, subject to a long term Framework agreement which will split fees from the cash flow after debt service from the old Town Mill assets, and (b) OTUTP and City will enter into agreements where City will maintain basic services for the site while OTUTP manages the further development.

Steps:

1. City Of Old Town makes offer on behalf of itself and OTUTP to acquire the property from MFGR in conjunction with closing of waste water and warehouse

2. OTUTP will borrow $1.0 million from FAME to acquire the property from MFGR, interest only for two years, with balance to be termed out and matched to future income from Fiberight, wood yard and power plant.

3. OTUTP will issue $4.0 million in senior notes to the seller which are tied to the purchase of land and equipment. Seller notes will be repaid through the refinancing of buildings and equipment for power and Fiberight and other uses. OTUTP will enter into negative covenants to ensure that the real estate is not leveraged unless the seller notes are repaid from specific locations that are refinanced. Seller notes will be minimally paid at a rate equal to $2.0 million for Fiberight, and $2.0 million for the power plant equipment as it is brought on line.

4. Fiberight and OTUTP will enter into a long term agreement to purchase /lease the site and post a $2.0 million stand-by letter of credit in favor of OTUTP during the term of the agreement The term of the Fiberight agreement will be for fifteen/20 years years at $65,000 per month fixed payment, based on a triple net lease or similar agreement. The first twenty four months of the agreement will be for interest only at $10,000 per month during the construction and ramp up of Fiberight. This lease would commence on or about July 2016 as currently planned.

5. OTUTP will assign the LOC from Fiberight to a credit line(s) to be used to pay seller notes as they come due.

6. City of Old Town will provide a backup agreement to OTUTP for $500,000 in short term financing vis a vis Camden Bank, in order to make up "Gap" timing which is subject to the timing of FAME approval.

Summary of Required Agreements;

1. Framework Agreement with MFGR to buy assets for $9.0 mil.

2. Lease Agreement with Fiberight

3. $2.0 million Letter of Credit Assignment from Fiberight

4. Feedstock & Energy Supply Agreement between OTUTP and Fiberight

5. Revenue Sharing agreement between City and OTUTP

6. Maintenance Agreement between OTUTP and City

7. Short Term Lending Agreement between City and OTUTP

25. On April 14, 2016, Mayo emailed an offer letter (the "4/14/16 Offer Letter," Exhibit B) to Firestone, Eakin, Edson, and Brent Folster of Camden National Bank, who was working with the City to provide financing for acquisition of the Facility. The 4/14/16 Offer Letter proposed terms and conditions for purchase of the Facility by the City, its proxy or its affiliate, which terms and conditions would be reduced to a binding letter of intent to be presented to the City Council for public vote in May. The "proxy or affiliate" referenced in the offer was understood by the City, OTU and MFGR to be OTU, in accordance with the structure laid out in Edson's April 11, 2016 email.

26. The 4/14/16 Offer Letter further included the following provisions.

a. The $9,000,000 purchase price would include $5,000,000 for the land, wastewater treatment plant, and warehouse, $4,000,000 of which would be paid May 31, 2016 and $500,000 of which would be paid June 1, 2016, and $500,000 of which would be paid June 1, 2017.

b. The remaining $4,000,000, to be paid for the remaining of the Facility, would be paid in three senior secured notes of $1,000,000, $1,000,000 and

$2,000,000, payable by July 1, 2019, July 1, 2020, and July 1, 2021, respectively.

c. The offer was conditioned on cancellation of the planned April 2016 auction for Facility assets, with the exception of agreed-upon items not necessary to refurbishment of the Facility. MFGR cancelled the auction.

d. The proposal was subject to financing of: (i) $3,000,000 from the United States Department of Agriculture's Rural Development Authority ("RDA") for the wastewater treatment plant; (ii) $1,000,000 from Camden National Bank for the warehouse assets; and (iii) $1,000,000 from the Finance Authority of Maine ("FAME") for the land. Camden National Bank and OTU would act as intermediaries to confirm that financing was arranged or committed and could reasonably be closed by July 1, 2016.

27. On April 22, Mayo sent a revised offer letter (the "4/22/16 offer letter," Exhibit C) to MFGR.

28. The 4/22/16 Offer Letter further included the following provisions.

a. The purchase price was increased to $9,500,000, which would include $5,000,000 for the land, wastewater treatment plant, and warehouse, $3,000,000 for the treatment plant, $1,000,000 for the finished goods warehouse, and $1,000,000 for the land, to be paid in three sequential closings between June 1, 2016 and July 30, 2016.

b. The City or its assign would have the right to purchase the remaining Facility assets for $4,500,000, within 30 months of the agreement date, with the right to purchase six-month extensions for up to a maximum of 24 months, at a

price of $50,000 per six-month extension per $1,500,000 in assets still subject to option.

c. The City would forego taxes due from MFGR for the second quarter of 2016, as a good faith payment in lieu of deposit, to be applied to the purchase price at the first closing.

d. The City would assume operation and security of the Facility July 1, 2016.

e. MFGR would agree not to solicit or negotiate with other parties, and would inform the City or its assign of any contact from parties interested in purchasing the Facility.

f. The proposal was subject to financing of: (i) $3,000,000 from the United States Department of Agriculture's Rural Development Authority "RDA") for the wastewater treatment plant; (ii) $1,000,000 from Camden National Bank for the warehouse assets; and (iii) $1,000,000 from the Finance Authority of Maine ("FAME") for the land. Camden Bank and OTU would act as intermediaries to confirm that financing was arranged or committed and could reasonably be closed by July 1, 2016.

29. OTU's introduction of the City as a purchaser of the wastewater treatment plant and the warehouse assets under the essential terms specified in the Advisory Agreement meant that OTU would be eligible to receive full costs and fees under the Advisory Agreement, so long as the City or its assign (including OTU), closed the purchase in accordance with agreements with MFGR.

30. In the meantime, in March 2016, Deschenes sought to terminate OTH's membership in OUT and his status as manager. Firestone told Eakin that Deschenes then

approached Firestone to acquire the Facility in competition with OTU, and that he [Firestone] had rejected the overture.

31. In April 2016, Deschenes sought to resume OTH's membership interest and his manager role in OTU, and Eakin and Edson permitted him to do so.

CITY OF OLD TOWN PURCHASE AGREEMENT

32. On April 28, 2016, Firestone, as authorized signatory for MFGR, signed a letter agreement reflecting the terms under which the City or its assigns would purchase the Mill Facility (the "4/28/16 Agreement," Exhibit D) for a total of $10,000,000. This agreement was the binding letter of intent to which the 4/14/16 Offer Letter referred, and reflected the further negotiations of OTU, MFGR and the City. The offer letter was addressed from Mayo. On Thursday, July 27, Barbara Levi of CRC emailed the final text to Eakin, ccing Firestone and PPL principal David Muslin ("Muslin"), stating that "Bill [Firestone] will be signing a pdf of this letter and forwarding to you under separate email."

33. MFGR, the City and OTU understood the "assigns" in this case to be OTU. OTU negotiated the essential terms amongst MFGR, the City and OTU, and all three parties proceeded from this point with OTU acting on behalf of both OTU and the City, with an understanding that MFGR would sell in accordance with the terms of the 4/28/16 Agreement, and the City and OTU would determine which assets the City should purchase and lease to its "assign," and which assets the "assign" should purchase outright.

34. The 4/28/16 Agreement contained the following terms.

a. $5,000,000 would be paid pursuant to "Part I" of that Agreement, in three sequential and independent closings in June 2016, with $3,000,000 paid for the waste water treatment plant, $1,000,000 for the finished goods warehouse, and $1,000,0000 for land. The prices for wastewater treatment plant and the warehouse were identical to those contemplated in the Advisory Agreement.

b. The City or its assigns would have the right to acquire all of the remaining Expera Mill Facility assets for an aggregate purchase price of $5,000,000 ($300,000 for the biomass boiler, $700,000 for all remaining power generation assets (including buildings, boilers, turbine and water intake), $2,000,000 for process buildings and parts, and $2,000,000 for warehousing and wood yard assets), within 24 months of contract execution, with an automatic 6-month extension if at least $1,500,000 in assets were purchased. If either Party wanted an extension of time beyond that point, Seller was obligated to negotiate therefore in good faith.

c. The City agreed to forego all personal and real estate taxes due from the Seller retroactively and through the second quarter of 2016 and/or until the closing of Part II by the City or its assigns.

d. The City or its assigns would assume operation of the Facility as of July 1, 2016, subject to final documentation acceptable to the City, its assigns, MFGR, and the Finance Authority of Maine ("FAME"), from which financing was anticipated. The Parties were mutually obligated to provide documentation to FAME by May 31, 2016 for approval.

e. The City or its assigns would pay MFGR 50% of any incremental value received through resale of or assignment of rights to purchase Part II assets.

f. MFGR was obligated to neither solicit nor negotiate with other parties at any time and up to the approval and closing with lenders, including Maine Rural Development Authority ("RDA"), Camden National Bank, and FAME. Seller was obligated to inform the City and its assigns about any contact from other potential buyers.

g. The sale was contingent on closing RDA financing for waste water treatment plant acquisition, Camden National Bank financing for the warehouse, and FAME financing for the land.

h. The agreement had a two-year term from July 1, 2016.

DEVELOPMENT OF PULP MILL BUSINESS MODEL, INITIATION OF EFFORTS BY CVG TO ACQUIRE THE FACILITY AND JOIN THE CON-ED SOLUTIONS BID

35. OTU recognized that the pulp mill operation had failed multiple times over the decades, so Relentless developed an operational structure to address the factors undermining the pulp mill's viability. Relentless determined that the pulp mill could not obtain wood chips as inexpensively as Canadian competitors, in part because Canadian operations typically avoid overhead by integrating chipping and pulping operations at a single site.

36. Relentless developed a combination of on-site chipping and a forestry cooperative ownership structure to spread risk and reduce cost amongst mill owner and suppliers, and to effectuate Edson's and Eakin's agreement on the value of limiting personal liability for financing. An ESOP was also included as a method of reducing

labor costs through equity participation. The cooperative structure would allow the pulp mill to weather cyclical downturns, and could be funded as a "corporate, standalone, credit" that was not dependent upon external financial statements.

37. In June, after Relentless worked with state and federal agencies and officials, a nonprofit with cooperative expertise, and others to refine the concept, Eakin presented the concept to Jeannot Carrier ("Carrier"), who hired a consultant from Canada to visit with OTU, and who sent a favorable report about the concept to Carrier.

38. Edson, Eakin and Deschenes met with Carrier, Tim Varney, and Tom Gardner ("Gardner"), as representatives of the Carrier, Varney and Gardner families (the "CVG families"), respectively, and with their accountant, Randy Bishop. On information and belief, on or about January 8, 2015, the CVG families had formed CVG, Inc. ("CVG"), a Maine corporation with principal place of business in Lincoln, Penobscot County, Maine, to pursue their joint interests. On information and belief, each family individually numbered among the largest timberland owners in the State of Maine.

39. The concept presented by OTU included an option whereby the cooperative could purchase the CVG families' chipping mills to eliminate debt obligations of the families related to those assets, and presumably to deliver a financial gain on assets that were marginal or operating at a loss due to industry decline.

40. CVG immediately recognized the possibility that their participation in ownership in the pulp mill might violate federal and state antitrust laws, given their collective timber market share and vertical and horizontal market power. Gardiner personally expressed that his family had experienced significant anti-trust concerns, and expressed concern whether they could be overcome through a cooperative.

41. CVG consulted with a specialist in Canadian cooperatives to determine whether the cooperative option was even feasible to explore, given antitrust concerns, and the specialist recommended further exploration. OTU, through Eakin Edson, and ,, worked with legal specialists, governmental agencies and officials to determine whether antitrust laws would prohibit the structure contemplated, particularly if cooperative membership was offered broadly to suppliers on a nonexclusive basis.

42. Discussions between CVG and OTU continued, and OTU, acting through Eakin, sent a follow-up response to Jeannot Carrier on or about July 17, 2017.

43. On information and belief, CVG came to view the proposed forestry cooperative as a threat to its owners' individual businesses, while CVG grew to recognize that it could further consolidate market power by acquiring the Facility. On information and belief, CVG viewed the forestry cooperative as a vehicle to permit smaller landowners to participate in chip sales to the pulp mill, sales that CVG's owners had historically dominated. On information and belief, CVG perceived that under the proposed structure, a broader swath of timber land owners would have access to chipping operations on terms identical to those the CVG families enjoyed, and that the families would not be able to a significant inventory of wood chips at the elevated prices that historically rendered the pulp mill uncompetitive. With control of the biomass facilities, CVG would have a potential opportunity to supply those facilities at elevated prices, capturing a substantial share of the potential savings that could result to the University from combined heat and power.

44. On information and belief, these realizations helped prompt CVG to seek to acquire the Facility in competition with OTU, and to oust Relentless from the ConEd Solutions Bid.

45. The ConEd Solutions Phase II RFP submission states the following with respect to CVG, describing the extent of CVG's vertical and horizontal market power.

> The Gardner, Carrier and Varney families have had a collaborative business relationship for many years capitalizing on their collective strengths in the forest products industry and in unique business capacities found in the portfolios of each family. […]
>
> The Gardner Companies supply pulpwood and custom wood chips for use in the manufacture of pulp, logs to sawmill for lumber, studs and boards, and biomass to energy plants. In addition to owning timberlands and logging operations, they own and operate a trucking fleet, chip mills, a sawmill, a mulch grinding operation, and utilize their extensive aggregate resources in collaboration with the other [families'] lines of business. Now in its third generation, the company was founded in 1961 and is based in Lincoln, Maine. Second generation family members Tom and Scott Gardner now manage the company and the company employs approximately one hundred and fifty Mainers.
>
> Similarly, the Carrier family businesses have been operating since the late 1960s with the third generation in active management of the ten diversified entities the family owns. The fourth generation is already working in the companies and the Carrier Companies are doing business in a dozen countries around the world. Carrier enterprises include sawmills, pellet mills, trucking companies, road and heavy construction as well as extensive forest holdings. Collectively, they employ over four hundred employees.
>
> For three generations the Varney family has operated a diverse and extensive group of companies. Their operations include insurance, insurance underwriting, broadband and communications, automobile and trucking sales and aviation. Several companies specialize in unique insurance products and services for the forest products industry as well as pulp and paper and other heavy industry. They collectively employ over two hundred and fifty persons.
>
> The Carrier, Varney, and Gardner families, through their diversified holdings, have collaborated on various projects for close to twenty years. Some examples include management of a variety of mills within the forest

> products industry, development and utilization of mechanized improvements to logging equipment, collaboration to add value to the forestry equipment insurance field, and cooperative efforts in trucking of various forest products. The more recent work together has been more formalized through the founding of CVG, Inc. to provide direct sawmill ownership for five mills with annual production exceeding 260 million board feet per year. CVG, Inc. operates in Canada and the US and employs four hundred. CVG Inc. and the individual family enterprises have access to almost a million acres of forest under management or control.
>
> CVG, Inc. and its partners will form a new entity, Penobscot Energy and Fiber Co. (PEFCo) as an umbrella to redevelop the Old Town facility.

46. On information and belief, the Varney family and two other partners joined E J Carrier in an acquisition of Materiaux Blanchet Inc., one of Canada's largest independent sawmill operators. Jean Carrier became Materiaux Blanchet Inc.'s president, and Tim Varney became on of the company's three directors.

47. An April 27, 2017 letter from CVG to ConEd Solutions, signed by Gardner (the "4/27/17 CVG Letter"), and included in Appendix D of ConEd Solutions' University RFP Phase II response, states the following.

> The opportunity to participate in a truly vertically integrated solution reaching from our timberlands to the planned biorefinery at Old Town to providing thermal energy and electricity to the University of Maine is an expression of a new paradigm for our companies. We have access to over 1,000,000 acres of timberland within 100 miles of Old Town, and expect to enter into a long-term contract with ConEdison to provide a guaranteed supply of biomass at a competitive price.

48. The letter indicates CVG's control of 1,000,000 acres of timberland within 100 miles of Old Town, and its intention to "integrate vertically," shutting out other suppliers from the opportunity to sell to what would be one of the State's major

consumers of forest products, at a time when markets for Maine forest products were contracting.

49. Maine's forest products industry was in June 2016 and has since remained under severe stress. Since 2014, five Maine pulp or paper mills have closed down, including facilities in East Millinocket, Lincoln, Old Town, Bucksport, and Madison. And others have reduced production. Maine's biomass industry is likewise under stress, evidenced by temporary closings of facilities in Jonesboro and Enfield, longer term closings of facilities in Bucksport and (for the moment) Old Town, and roughly $13,500,000 in biomass industry subsidies provided under 2015 Public Law, Chapter 483. Since 2015, at least four wood pellet plants have had temporary shutdowns. All of these trends result in reduced market opportunities for timber land owners, and enhance the value of vertical integration for oligopolies in the industry.

50. The article *The State of the Northeast Regional Pulp Market*, published by Eric Kingsley of Innovative Natural Resource Solutions LLC in the February 2017 issue of *The Northern Logger and Timber Processor Magazine* details the following facts about the forest products industry in Maine. The above-described closings have resulted in the loss of 3,000,000 tons of pulpwood and mill chip markets since 2014, not counting the lost biomass markets at the mills. This has in turn resulted in falling softwood prices. Pulp and paper mill closings mean sawmills are less able to rely on those consumers to buy mill chips, sawdust and bark produced by their operations.

<u>IMPLEMENTATION OF THE 4/28/16 AGREEMENT</u>

51. In June through October 2016, the City, OTU and MFGR worked to close sale of the Facility in accordance with the 4/28/16 Agreement. Attorney Jim Barns represented the buyers, directed by OTU, acting through Eakin.

52. In June 2016, the State of Maine's approach to regulation of stormwater treatment changed. requiring that the pulp mill and the treatment plant be in common ownership. This change meant that the waste water treatment plant was no longer a candidate for separate ownership by a municipality, effectively requiring that the pulp mill and the treatment plant be in common ownership. This was of concern to MFGR, as one of the owners had a bad experience with ownership of a waste water treatment plant.

53. In June 2016, for reasons including the State's new regulatory approach to the treatment plant, the City elected to have OTU purchase the Facility, as permitted under the 4/28/16 Agreement, with the City providing financing of $3,000,000. The University's Forest Bioproducts Research Institute ("FBRI") was leasing warehouse space at the Facility, and OTU and the City agreed that it was essential to negotiate a long-term lease for that space with the University, to provide security for the City's bond. OTU, acting through Eakin, negotiated such a lease on behalf of OTU and the City, in consultation with the City and with MFGR's knowledge and consent, and finalized it in July 2016. Concurrently, OTU entered into negotiations with Sibley Transportation, which specializes in transporting paper rolls, as a new tenant for 100,000 square feet of warehouse space.

54. On or about July 5, 2016, Attorney Barns circulated to MFGR and OTU a draft buy-sell instrument that reflected the desire of MFGR, the City and OTU to effectuate the 4/28/16 Agreement through purchase of the Facility by OTU, rather than

the City. The draft was based on the discussions of the Parties, and included the following essential terms.

a. Purchase of the Facility would be in three Phases, with Phase I and Phase II to be concluded concurrently. Phase I included OTU's purchase of the Land and Warehouses for $2,500,000, financed by MFGR, with payment in full due on the later of September 30, 2016 or 75 days from execution of the buy-sell instrument. Phase II included OTU's purchase of the wood yard, digestors, process plant, wastewater treatment plant, and administrative buildings for $2,500,000, and OTU's purchase of MFGR's capital stock for $250,000, financed by the Seller, with the seller receiving a Lien in Lieu of payment for the Phase II assets, allowing for quick transfer to MFGR in a case of default. OTU would also pay $100,000 toward carrying cost of the Facility through closing of Phase I and Phase II. Phase II would entail purchase of the power plant and related assets for $5,000,000, half in cash and half in seller notes, payable over the course of seven years in operation.

b. The instrument contemplated $2,500,000 in financing for Phase I from the City, $2,500,000 in financing for Phase II financed by MFGR, with takeout by FAME and Camden National Bank, and $2,500,000 in financing for Phase III from a combination of ConEd Solutions, Camden National, FAME, and others.

55. On or about July 9, 2016, MFGR, through Firestone, communicated the following concerns about the draft, each of which was immediately addressed in a response email from Eakin. (i) Firestone wanted to ensure that Phase II assets would

transfer immediately to MFGR in the event of default, without bankruptcy intervention. Eakin pointed out that the Lien in Lieu of payment provision accomplished that. (ii) Firestone wanted to ensure that in the event of default MFGR had unfetterered access to remove assets. Eakin pointed out that the draft instrument provided for that. (iii) Firestone wanted to ensure that for Phase III, MFGR would retain the boiler and the land it sits on and/or easement for pipelines as needed for the operation and generation of electricity to the University. Eakin pointed out that the draft instrument provided for that. (iv) Firestone expressed a desire for "Phase IV" financial terms to be bracketed until the revenue potential was fully understood. Eakin pointed out that there was no Phase IV. (v) Firestone wanted to make sure that if the City purchased the wastewater treatment plant from OTU within two years, MFGR would receive 50% of any payment amount above what OTU paid for it. Eakin pointed out that the draft instrument already provided for that. (vi) Firestone wanted to bracket the escrow funding until a number was settled, in light of the operational budget for the wastewater treatment plant, which he attached to his email. Eakin stated he would review and respond.

56. Beyond these concerns, most of which were already addressed in the draft instrument, Firestone's email expressed no disagreement with the instrument's essential provisions.

57. On July 13, Mayo emailed Firestone to confirm that the City Council had authorized the City to make final public announcements regarding issuance of a general obligation bond to finance purchase of the Facility's land and warehouse assets, in accordance with the 4/28/16 Agreement. He clarified that the second reading would be completed July 28, and that closing could take place thereafter, subject to documentation.

58. In early August 2016, after a series of conference calls involving OTU, the City and MFGR, Attorney Barns delivered a draft buy-sell instrument that reflected the desire of MFGR, the City and OTU to effectuate the 4/28/16 Agreement through purchase of the Facility by OTU, rather than the City. Around that time, the City, OTU and MFGR had a conference call to discuss final closing, and agreed that execution of the buy-sell instrument and provision of required exhibits by MFGR were the chief remaining items required to close.

59. In early August 2016, Deschenes once again sought to terminate OTH's membership and his manager rolein OTU, and asked to be released from noncompete and nondisclosure restrictions. Eakin resisted such a release, but Edson advocated for it, and Eakin agreed to it, with specific confirmation from Deschenes that he would in no way engage in any competition with OTU. Deschenes replied that he had decided to return to this native Canada and would not engage in any competition against OTU.

60. On information and belief, Deschenes has a longstanding relationship with the CVG families, through his history of facility management at the Facility. Deschenes told Eakin that in his past capacity as a facility manager at the Facility, he had urged the Carrier and Gardner families to advance inventories to the Old Town mill, they had done so, and they had lost roughly $6,000,000 when the mill failed.

61. As described below, within less than 30 days of Deschenes's departure, CVG entered into a letter of intent to purchase the Facility from MFGR, which (on information and belief) was facilitated by Deschenes.

62. In early August 2016, OTU and the City discovered that the Facility's tissue building warehouse property required substantial repairs. They immediately began working with MFGR to address the issues raised.

63. On August 12, Edson sent an email to Eakin, Kevin Paradis ("Paradis") of MFGR, Mahan, Mayo and others. He indicated that lawyers for OTU and MFGR had agreed on recitals for the buy-sell instrument and were pulling together attachments and exhibits, and that MFGR had, through Firestone, verbally agreed to all terms of the buy-sell instrument. Kevin Paradis was included because he was charged with providing information about the tissue building roof issue.

64. On August 13, Eakin emailed an update and time table to Firestone, Muslin, Gordon Brothers principal Bob Maroney ("Maroney"), Edson, a University representative, and attorneys on both sides. All parties had agreed that the buy-sell instrument could be ready for closing by August 26, 2016. The attorneys were tasked with itemizing attachments and finalizing buy-sell instrument language, Sewall was tasked with land related documents.

65. On August 14, 2016, Mahan sent an email to Eakin, Edson, Paradis and others, asking Edson to join weekly meetings (Wednesdays at 4:00 PM) with Mahan, Mayo, and City Councilor Stan Peterson. Mahan did not invite Eakin to participate physically or telephonically in those meetings.

66. In an August 16 email from Mayo to Edson, Mayo noted that Deschenes was asking for a report on the tissue building roof issue. Edson emailed Mahan, Mayo and Eakin to note that Deschenes was withdrawing from OTU, and urging that Deschenes should not receive that report.

67. On information and belief, Deschenes introduced CVG to MFGR and was facilitating CVG's efforts to acquire the Facility, providing them information about the City's and OTU's dealings with MFGR. On information and belief, Deschenes sought the tissue building roof report on CVG's behalf.

68. On or about August 21, 2016, the ConEd Solutions Team learned that it was one of four finalists to proceed to Phase II of the RFP. In the ensuing months, ConEd Solutions would remove Relentless from the RFP team, and would include Penobscot Energy & Fiber, LLC, a Maine limited liability company with principal place of business in Old Town, Penobscot County, Maine, formed by CVG and its partners to redevelop the Facility. This would be done without notice to Eakin.

69. On information and belief, the ConEd Solutions Phase II Response could not include a different team than its Phase I Response, unless it sought and received the University's consent. Eakin is unaware of any public record of request or permission to alter the RFP team. The purpose of Phase I was to determine which teams had the best qualifications to compete for the RFP, so alteration of the chief factor (team identity and qualifications) on which entry to Phase II was based would be a weighty matter.

70. On September 1, 2016, emails among David Mahan ("Mahan"), the City's mayor, Mayo, Eakin and Edson referenced the understanding among the City, OTU and MFGR that the City would issue a $3,000,000 bond to finance Phase I of OTU's acquisition of the Facility, and that the City was waiting to receive the closing documents discussed in the August conference call. Mahan referenced a meeting with Firestone after that call, where he reiterated the need for said documents. MFGR was charged with producing the exhibits, and had yet to do so.

71. The ConEd Solutions Phase II Energy Solutions RFP response states that on September 1, 2016, CVG and MFGR signed a letter of intent (the "CVG LOI") for CVG to purchase the Facility. The 4/28/16 agreement forbade MFGR from soliciting and accepting competing offers to purchase the Facility, and obligated MFGR to notify the City and OTU of any solicitation received. Neither MFGR nor anyone else notified Eakin about the CVG LOI, or about solicitation by CVG.

72. On September 5, 2016, Edson emailed Eakin, Mayo, Mahan, and Ronald Harriman (the City's Economic Development Director), updating them on progress. He described OTU as currently closing the second lease on the finished goods warehouse and getting a final estimate for roof repair at the tissue building.

73. On September 11, 2016, Eakin sent an email to Firestone, Maroney, Muslin and Edson, with an attached update. It reflected that the City had been through all the public requirements for the $3,000,000 bond financing, and described agreement between OTU and MFGR on an approach to addressing the roof problems with the tissue building. It also described application for FAME financing being submitted by September 15, 2016, and the application for RDA financing being submitted by October 1, 2016. It projected closing on the finished goods warehouse by September 30, 2016 to begin the series of closings called for under the buy-sell instrument.

74. On or about September 23, Mahan conveyed to Eakin and Edson the City's preference to purchase the warehouse assets directly, with OTU acquiring the remaining assets. No change was proposed that would impact MFGR, as the sale was going to be financed by the City's bond either way.

75. Sewall set a September 27 conference call on the project, with Edson, Eakin and Mahan participating.

76. Attorney Barns visited the Mill site and Mahan on September 28, 2016.

OUSTER OF OTU FROM FACILITY PURCHASE AND OF RELENTLESS FROM THE UNIVERSITY RFP

77. In early October 2016, Firestone notified OTU that a competing buyer was seeking to purchase the Facility – CVG. Firestone represented to Eakin that the buyer would pay out $4,000,000 in December 2016, and that the deal did not involve financing from the City. On information and belief, this was untrue, and that full payment was not slated to be completed until well into 2017. On information and belief, Firestone and Mahan participated in negotiations with CVG that led to CVG's secret September 1, 2016 letter of intent.

78. On October 10, 2016, Firestone gave OTU two weeks to respond with a counter offer to the CVG offer.

79. On October 10, 2016, Eakin emailed a project update to Mayo, Mahan Edson, and representatives of FAME and the University. The update noted that the buy-sell instrument had been negotiated for the City to purchase the first $1,800,000 of warehouse space (with the remainder to be purchased once roof issues were resolved). It indicated that a pulp plant tenant had been identified, that FAME and Camden National Bank were awaiting an application for bridge financing, and that a buy-sell instrument for Phase III was completed. It indicated that significant and unexpected delays in the University's RFP process had delayed closing, and that MFGR was entertaining other buyers.

80. On October 19, 2016, Edson and Eakin fashioned an offer to close the deal to purchase the entire Facility for $5,000,000 in cash, and $2,000,000 in seller financing, with redemption of the $2,000,000 on January 15, 2017, with the remaining essential terms of the buy-sell instrument remaining the same. After sharing with Mahan, they conveyed the offer to Firestone.

81. On October 20, 2016, Edson, Eakin and others met with biotech company API to begin negotiations for their involvement in repurposing the pulp operation. On information and belief, Deschenes and Mahan made direct contact with API's Chief Financial Officer to redirect and undermine OTU negotiations.

82. Between October 15 and October 20, 2016, Edson met with Gardner, who had been identified as the lead voice of the competing group of investors. Edson told Eakin that Gardner did not plan to pursue the University RFP, but rather had other uses for the Facility.

83. Eakin would later learn, in a December 16 phone call from Ward Strosser of ConEd Solutions, that ConEd Solutions had begun weekly meetings with CVG since early October 2016. On information and belief, initial discussions leading up to those meetings would have had to commence even earlier than that, in September 2016 if not earlier.

84. On or about October 24, 2016, Firestone stated that he did not believe that the waste water treatment plant would be transferred concurrently with Phase I. Attorney Barns held a conference call with Firestone to indicate that he was incorrect: every iteration of the buy-sell documents, including the most recent to which he had assented in full, clearly provided for transfer of the treatment plant at the same time as the land and

warehouse purchase; every call on the subject had indicated that the treatment plant and the land and warehouse would be transferred at the same time. The chief barriers to closing at that time were MFGR's failure to provide required exhibits relative to permits and licenses, and resolution of the tissue building roof issue.

85. Attorney Barns emailed Eakin and Edson this information on October 24, 2016. The email stated the following.

> I understand that Mr. Firestone has indicated that he believes the waste water treatment plant would not be transferred concurrently with Phase I. This, in fact, has never been the case. The buy-sell documents submitted to Mr. Firestone and his attorney have all been very clear that you intended to close on the waste water treatment plant at the same time as the land and warehouse purchase. This has never changed in the documents or in the many phone calls we have had. We even held a conference call with him to explain that he was incorrect. To my knowledge, the buy sell document was virtually complete based on continuous, detailed good faith negotiations. The completed negotiations and signing were delayed by exhibits required from MFRG relative to permits and licenses, as well as the discovery of the roof problems on the warehouse. Both of these issues can be resolved in short order if we can speak to the attorneys once again.

86. On October 24, 2016, Eakin emailed Firestone, ccing Maroney, Muslin, Mahan, Mayo and others, forwarding Attorney Barns's objections and expressing concern that MFGR was questioning long-settled matters, at a time when MFGR was also inappropriately instructing at least one future tenant that OTU had procured to communicate with MFGR to the exclusion of OTU.

87. Shortly thereafter, MFGR declined to sell to OTU, electing to sell to CVG and its partners.

88. In November 2016, Edson and Eakin agreed that legal options should be reviewed, and Eakin began that process. Edson sent Dave Stevens ("Stevens"), Sewall's Chief Operating Officer to determine OTU's position in the RFP team. At that time,

Edson called Eakin to tell him that ConEd Solutions had agreed to repay OTU's expenses. Eakin had not previously been consulted about that possibility.

89. On November 28, 2016, Eakin and Edson had a conference call with Ward Strosser ("Strosser") and Jack Bosch ("Bosch") from ConEd Solutions to discuss ConEd Solutions advancing funds to purchase the Facility. Neither Strosser, Bosch nor Edson disclosed that they were working with Gardner and the opposing buyers at the time.

90. On December 15, 2016, Edson emailed Eakin an attached written termination of its membership in OTU, and sent hard copies via FedEx.

91. On or about December 15, 2016, Strosser called Eakin, saying ConEd Solutions was looking for a role for Eakin to play in the RFP. At that time, Jake Ward, the University's Vice President of Innovation and Economic Development, informed Eakin that the University had been in discussions with Edson and Gardner about the University's lease at the Facility for eight weeks.

92. On December 22, 2016, Strosser informed Eakin that ConEd and Edson had been meeting privately with the competing buyers since early October 2016. On information and belief, initial discussions leading up to those meetings would have had to commence even earlier than that, in September 2016 if not earlier.

93. ConEd's actions in ousting Relentless and coordinating with CVG breached its Teaming Agreement.

94. In June 2016, the ConEd proposal won the bid with 82 points, followed by Honeywell International with 73.8 points, Ameresco with 66.5 points, and Energy Systems Group with 53.6 points. Ameresco and Honeywell have appealed the decision.

95. To date, MFGR has not closed a sale of the Facility.

**COUNT I**
**BREACH OF CONTRACT – MFGR (Plaintiff OTU vs. Defendant MFGR)**

96. Plaintiff OTU realleges and incorporates by reference the allegations of Paragraphs 1 through 95 of this Complaint.

97. OTU and MFGR entered into a valid and enforceable contract for purchase of the Facility (the "Purchase Contract"), reflected in a signed writing and evidenced by months of partial performance by both parties.

98. In the alternative, the course of dealing among OTU, MFGR and the City after the 4/28/16 Agreement was executed established that OTU was an intended third party beneficiary of a valid and enforceable contract between MFGR and the City, reflected in a signed writing and evidenced by months of partial performance by both Parties.

99. OTU performed under the Purchase Contract, to the extent permitted by MFGR's actions.

100. MFGR breached the Purchase Contract, or in the alternative, the 4/28/16 Agreement, in the following ways.

a. MFGR solicited an alternative buyer.

b. MFGR entered into an agreement to sell to an alternative buyer.

c. MFGR failed to timely disclose both the solicitation of the alternative buyer and the purchase agreement with the alternative buyer.

d. MFGR failed to perform its obligations to finalize documentation so that sale of the Facility could be closed.

e. MFGR refused to sell the Facility to OTU pursuant to contractual terms.

f. MFGR's course of conduct in soliciting alternative buyers, contracting with them, failing to timely disclose these matters, delaying documentation to thwart OTU's efforts to reach a closing, and pretextually objecting to long-settled terms of the agreement regarding sale of the wastewater treatment plant, breached an express written covenant

101. As a result of MFGR's breach, OTU has suffered damages, including but not limited to: deprivation of the value of purchasing the Facility; exclusion from the team implementing the ConEd Solutions Energy RFP Bid; and expenditure of time, money and resources in pursuing the transaction, lining up financing, tenants and development partners.

**WHEREFORE**, Plaintiff OTU respectfully requests that this Court grant judgment in favor of Plaintiff OTU and against Defendant MRGH, award Plaintiff OTU damages, award prejudgment and postjudgment interest, and award Plaintiff OTU such other relief as the Court deems appropriate.

## COUNT II
## SPECIFIC PERFORMANCE (Plaintiff OTU vs. Defendant MFGR)

102. Plaintiff OTU realleges and incorporates by reference the allegations of Paragraphs 1 through 101 of this Complaint.

103. Remedies at law are not adequate to address MFGR's breach of the Purchase Agreement, or in the alternative, of the 4/28/16 Agreement, of which OTU was an intended third party beneficiary.

104. Remedies at law are not adequate to address MFGR's breach.

105. OTU has a likelihood of success on the merits of their claims in.

106. Irreparable injury would result to the OTU, absent injunctive relief, and the irreparable injury to OTU would outweigh harm to MFGR.

107. The public interest would not be harmed by the granting of injunctive relief.

108. The value of the Facility has decreased, due to the long delay in closing caused by the breaches detailed in Count I

109. It would be equitable for the Court to exercise its discretionary power to compel MFGR to specifically perform the Purchase Agreement, or in the alternative, to specifically perform the 4/28/16 Agreement in conjunction with agreed terms in the buy-sell instrument that OTU and MFGR drafted to finalize sale of the Facility to OTU, with adjustments for the decrease in value caused by the delay in closing purchase, and to enjoin any transaction that would prevent specific performance.

**WHEREFORE**, Plaintiff OTU respectfully requests that this Court grant judgment in favor of Plaintiff OTU and against Defendant MRGH, compel specific performance of the Purchase Agreement (or in the alternative of the 4/28/16 Agreement in the manner contemplated in the buy-sell instrument that OTU and MFGR drafted to finalize sale of the Facility to OTU), with adjustments for the decrease in value caused by the delay in closing purchase, enjoin any transaction that would prevent specific performance, and award Plaintiff OTU such other relief as the Court deems appropriate.

**COUNT III**
**BREACH OF CONTRACT (Plaintiff OTU vs. Defendant MFGR)**

110. Plaintiff OTU realleges and incorporates by reference the allegations of Paragraphs 1 through 109 of this Complaint.

111. The Advisory Agreement constituted a valid and enforceable agreement between OTU and MFGR.

112. OTU secured a purchaser for the wastewater treatment plant and the warehouse assets in accordance with the Advisory Agreement, in each case by the applicable Contract Deadline. To the extent, either asset did not meet the applicable Contract Deadline, MFGR made no such assertion at any point, and OTU's and MFGR's course of conduct in the months following the April agreements amongst the City, OTU and MFGR indicated that MFGR intended to pay the fees and costs due with respect to both assets, and waived any objection based on the Contract Deadline. With respect to the Closing Deadlines, pursuant to the Purchase Agreement or, in the alternative, to the 4/28/16 Agreement, MFGR and OTU had reached agreement with respect to closing dates. Any extension of closing dates constituted a waiver of those deadlines under both (i) the Advisory Agreement and (ii) the Purchase Agreement or, in the alternative, of the 4/28/16 Agreement. Moreover, breaches by MFGR described in Count I effectively thwarted OTU in closing the sale.

113. MFGR breached the Advisory Agreement in the following ways.

a. MFGR breached the Purchase Agreement, or in the alternative, the 4/28/16 Agreement. To the extent the ultimate purchaser of the Facility does not trigger payment of fees and costs to OTU, it is due to the bad faith acts of MFGR.

b. MFGR breached express provisions of the Advisory Agreement preventing it from manipulating the purchase and sale process to deprive OTU of fees and costs.

c. Insofar as Deschenes introduced CVG to MFGR, Deschenes was at the time still an agent of OTU. Although he had sought to withdraw from OTU membership, the 30-day notice period for such withdrawal had not lapsed at the time. MFGR's refusal to pay fees and costs for any sale to CVG and its associates would thus constitute breach. Given that the agreement to sell to CVG and its associates was a breach of both the Purchase Agreement (or in the alternative, the 4/28/16 Agreement) and the Advisory Agreement, MFGR cannot enforce the Contract Deadline in this instance.

114. As a result of MFGR's breach, OTU has suffered damages, including but not limited to: deprivation of the costs and fees due under the Advisory Agreement; and expenditure of time, money and resources in pursuing the transaction, lining up financing, tenants and development partners.

**WHEREFORE**, Plaintiff OTU respectfully requests that this Court grant judgment in favor of Plaintiff OTU and against Defendant MRGH, award Plaintiff OTU damages, award prejudgment and postjudgment interest, and award Plaintiff OTU such other relief as the Court deems appropriate.

## COUNT IV
## PROMISSORY ESTOPPEL (Plaintiffs OTU, Relentless and Eakin vs. Defendant MFGR)

115. Plaintiff OTU realleges and incorporates by reference the allegations of Paragraphs 1 through 114 of this Complaint.

116. MFGR promised to sell the Facility to OTU, a promise that MFGR should reasonably have expected to induce action on the part of OTU, Relentless and Eakin, and which in fact induced action on the part of OTU, Relentless and Eakin. OTU, Relentless and Eakin reasonably relied on MFGR's promise, to their detriment.

117. MFGR breached its promise, in the manner described in Count I.

118. As a result of MFGR's breach, OTU, Relentless and Eakin have suffered damages, including but not limited to: deprivation of the value of purchasing the Facility; exclusion from the team implementing the ConEd Solutions Energy RFP Bid; and expenditure of time, money and resources in pursuing the transaction, lining up financing, tenants and development partners.

**WHEREFORE**, Plaintiffs OTU, Relentless and Eakin respectfully request that this Court grant judgment in favor of Plaintiffs and against Defendant MRGH, award Plaintiffs damages, award prejudgment and postjudgment interest, and award Plaintiffs such other relief as the Court deems appropriate.

**COUNT V**
**PROMISSORY ESTOPPEL (Plaintiffs OTU, Relentless and Eakin vs. Defendant MFGR)**

119. The Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 118 of this Complaint.

120. MFGR promised to pay fees and costs to OTU, in the manner described in the Advisory Agreement, a promise that MFGR should reasonably have expected to induce action on the part of OTU, Relentless and Eakin, and which in fact induced action

on the part of OTU, Relentless and Eakin. OTU, Relentless and Eakin reasonably relied on MFGR's promise, to their detriment.

121. MFGR breached its promise, in the manner described in Count II.

122. As a result of MFGR's breach, OTU, Relentless and Eakin have suffered damages, including but not limited to: deprivation of the value of purchasing the Facility; exclusion from the team implementing the ConEd Solutions Energy RFP Bid; and expenditure of time, money and resources in pursuing the transaction, lining up financing, tenants and development partners.

**WHEREFORE**, Plaintiffs OTU, Relentless and Eakin respectfully request that this Court grant judgment in favor of Plaintiffs and against Defendant MRGH, award Plaintiffs damages, award prejudgment and postjudgment interest, and award Plaintiffs such other relief as the Court deems appropriate.

**COUNT VI**
**UNJUST ENRICHMENT (Plaintiffs OTU, Relentless and Eakin vs. Defendant MFGR)**

123. The Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 122 of this Complaint.

124. OTU, Relentless and Eakin conferred numerous benefits on MFGR throughout the course of dealing described herein. Plaintiffs laid the foundation for financing from the City and others, recruited and negotiated terms with future tenants that increased the Facility's value and creditworthiness, and played an instrumental role in the winning ConEd Solutions bid that likewise increased the Facility's value and creditworthiness.

125. MFGR knew of and appreciated the value of those benefits.

126. The acceptance or retention of those benefits by MFGR under the circumstances herein make it inequitable for MFGR to retain the benefit without payment of its value.

**WHEREFORE**, Plaintiffs respectfully request that this Court grant judgment in favor of Plaintiffs OTU, Relentless and Eakin and against Defendant MRGH, award Plaintiffs the value of the benefits conferred on MFGR, award prejudgment and postjudgment interest, and award Plaintiffs such other relief as the Court deems appropriate.

**COUNT VII**
**CONTRACT, COMBINATION AND CONSPIRACY IN RESTRAINT OF TRADE AND TO MONOPOLIZE TRADE, 10 M.R.S.A. §§1101 *et seq.* (Plaintiffs OTU, Relentless and Eakin vs. Defendants MFGR, Firestone, OTH and Deschenes)**

127. The Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 126 of this Complaint.

128. CVG possesses substantial vertical and horizontal market power in Maine's forest products industry.

129. Acquisition of the Facility by CVG, or by a combination of persons or entities that includes, is affiliated with, or is controlled by CVG, would allow CVG to use that vertical and horizontal market power to shut all other forest products suppliers out of the opportunity to sell products to the Facility, and would allow CVG to charge elevated prices for their [CVG's] forest products, at a time when paper mill, pulp mill, biomass generator and pellet mill closings have severely reduced opportunities for forest products suppliers to sell their products. Moreover the rest of Maine's forest products industry would be foreclosed from participating in the unique opportunities the Facility affords to

sell biomass-fired heat and power to a large customer like the University, and to sell forest products to buyers in value-added industries like the biofuel industry, at what is likely the single best site for such sales in terms of infrastructure and access to research and development resources. These end users of forest products would be uniquely able to pay elevated prices for forest products, and CVG's ownership of the Facility would exclude the entire rest of the industry from that opportunity.

130. The 4/27/17 CVG Letter described both CVG's substantial market power, and its intention to expand that market power through vertical integration with the Facility, gaining an exclusive right to sell its products to the facility. The damage caused by businesses with horizontal market power engaging in vertical integration was a driving force behind the passage of Maine's antitrust laws.

131. The acquisition of the Facility by CVG, or by a combination of persons or entities that includes, is affiliated with, or is controlled by CVG, would restrain trade and commerce in Maine, pursuant to 10 M.R.S.A. §1101.

132. MFGR's contract to sell the Facility to CVG, or to a combination of persons or entities that includes, is affiliated with, or is controlled by CVG, is a contract in restraint of trade or commerce in Maine, and a consummated transaction in accordance therewith would be a combination in restraint of trade or commerce in Maine, both in violation of 10 M.R.S.A. §1101. A consummated transaction would also substantially lessen competition or tend to create a monopoly in lines of commerce in Maine, including in the sale of forest products, in violation of 10 M.R.S.A. §1102-A.

133. The monopoly rents that CVG could enjoy from restraining trade in the manner described above positioned them to outbid entities like OTU, who lack the

horizontal and vertical market power to extract such rents, and was a factor in MFGR's decision to breach its contracts with OTU in favor of sale to CVG and its associates, and in Deschenes's and OTH's efforts to induce MFGR's breach.

134. Firestone is liable individually, and not merely as a principal for MFGR, and Deschenes is liable individually, and not merely as a principal for OTH, for violations of Maine's Monopolies and Profiteering laws,

135. Remedies at law are not adequate to address the Defendants' efforts to restrain trade in the forest products industry.

136. The Plaintiffs have a likelihood of success on the merits of their claims in this count.

137. Irreparable injury would result to the Plaintiffs, absent injunctive relief, and the irreparable injury to the Plaintiffs would outweigh harm to the Defendants.

138. The public interest would not be harmed by the granting of injunctive relief. It would be enhanced by the protection of the public from restraint of trade in the forest products industry.

139. As a result of these violations of Maine's Monopolies and Profiteering laws, OTU has suffered damages, including but not limited to: deprivation of the value of purchasing the Facility; exclusion from the team implementing the ConEd Solutions Energy RFP Bid; and expenditure of time, money and resources in pursuing the transaction, lining up financing, tenants and development partners.

**WHEREFORE**, OTU, Relentless and Eakin respectfully request that this Court grant judgment in favor of Plaintiffs and against Defendants MRGH, Firestone, OTH, and Deschenes, jointly and severally, award Plaintiffs treble damages, award

prejudgment and postjudgment interest, award Plaintiffs their costs, attorneys' fees, necessary and reasonable investigative costs, and reasonable experts' fees, enjoin sale of the Facility to CVG, to any buyer directly or indirectly affiliated with or controlled by CVG, or to any other buyer whose acquisition of the Facility would restrain trade in the forest products industry, and award Plaintiffs such other relief as the Court deems appropriate.

**COUNT VIII**
**BREACH OF CONTRACT (Plaintiffs OTU, Relentless and Eakin vs. Defendants OTH and Deschenes)**

140. The Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 139 of this Complaint.

141. OTU's Operating Agreement was a valid and enforceable agreement to which OTH, Deschenes, OUT, Eakin and Relentless were parties.

142. The Operating Agreement expressly confirmed the Managers' duty of loyalty to OTU, duty not to exploit a business opportunity without first disclosing and offering it to the LLC, and duty of confidentiality.

143. OTH and Deschenes breached the operating agreement, as well as their duty of loyalty, their duty not to exploit a business opportunity without first disclosing it to OTU, and their duty of confidentiality when they facilitated CVG's opportunity to purchase the Facility from MFGR. OTU did not waive any of these rights with respect to activities of OTH and Deschenes that might be in direct competition with OTU. During the time extending from the beginning of their efforts to induce a purchase agreement between CVG and MFGR, and the September 1, 2016 letter of intent between those parties, OTH was still a member of OTU, and Deschenes was still a manager.

144. As a result of OTH's and Deschenes's breach, the Plaintiffs have suffered damages, including but not limited to: deprivation of the value of purchasing the Facility; exclusion from the team implementing the ConEd Solutions Energy RFP Bid; and expenditure of time, money and resources in pursuing the transaction, lining up financing, tenants and development partners.

**WHEREFORE**, The Plaintiffs respectfully request that this Court grant judgment in favor of Plaintiffs OUT, Relentless and Eakin and against Defendants OTH and Deschenes, award the Plaintiffs damages, award prejudgment and postjudgment interest, and award the Plaintiffs such other relief as the Court deems appropriate.

**COUNT IX**
**BREACH OF FIDUCIARY DUTY (Plaintiffs OTU, Relentless and Eakin vs. Defendants OTH and Deschenes)**

145. The Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 144 of this Complaint.

146. Both (i) OTH as a coequal member with Sewall and Relentless and (ii) Deschenes as a manager had a fiduciary relationship with OTU it members, and owed OTU and its members a duty of loyalty. The operating agreement expressly confirmed these fiduciary relationships and duties of loyalty.

147. When OTH and Deschenes facilitated CVG's opportunity to purchase the Facility from MFGR, each breached their respective fiduciary duty and duty of loyalty to OTU and its members through self-dealing, usurpation of corporate opportunity, misrepresentation and omission of material facts, inducement, disclosure and misuse of confidential information, misuse of superior knowledge, failure to disclose, and rendering inappropriate advice. During the time extending from the beginning of their efforts to

induce a purchase agreement between CVG and MFGR, and the September 1, 2016 letter of intent between those parties, OTH was still a member of OTU, and Deschenes was still a manager.

148. Remedies at law are inadequate for OTH's and Deschenes's breach of fiduciary duty and duty of loyalty.

149. As a result of OTH's and Deschenes's breach of fiduciary duty and duty of loyalty, the Plaintiffs have suffered damages, including but not limited to: deprivation of the value of purchasing the Facility; exclusion from the team implementing the ConEd Solutions Energy RFP Bid; and expenditure of time, money and resources in pursuing the transaction, lining up financing, tenants and development partners.

**WHEREFORE**, The Plaintiffs respectfully request that this Court grant judgment in favor of Plaintiffs OTU, Relentless and Eakin and against Defendants OTH and Deschenes, award the Plaintiffs damages, award prejudgment and postjudgment interest, require an accounting, impose constructive trusts with respect to any assets or proceeds thereof that OTH or Deschenes procured as a result of their breach of fiduciary duty and duty of loyalty, and award the Plaintiffs such other relief as the Court deems appropriate.

Dated at Scarborough, Maine, this 5th day of September, 2017.

______________________________
CLIFFORD M. GINN, Bar No. 9919
GINN LAW, LLC
62 Marion Jordan Road
Scarborough, ME 04074
(207) 274-0001

Attorney for Plaintiffs
Old Town Utility & Technology Park, LLC,
Relentless Capital Company, LLC, and
Samuel Eakin

**VERIFICATION**

I, Samuel Eakin, in my individual capacity, in my capacity as Managing Partner of Old Town Utility & Technology Park, LLC, and in my capacity as Managing Director of Relentless Capital Company, LLC, have personal knowledge of all the facts stated above, except with respect to statements identified as being made on information and belief. I am over 21 years of age, and am competent to testify to the matters set forth above. I hereby swear under pains and penalties of perjury that all of those facts pertaining to the Defendants are true and accurate to the best of my knowledge, information, and belief.

Date: September _____, 2017

_________________________________
Samuel Eakin, Individually, as Manager of Old Town Utility & Technology Park, LLC, and as Manager of Relentless Capital Company, LLC,

State of Maine,
County of Cumberland

Personally appeared before me the above-named Samuel Eakin, in his individual capacity, in his capacity as Manager of Old Town Utility & Technology Park, LLC, and in his capacity as Manager of Relentless Capital Company, LLC, and acknowledged the foregoing instrument to be his free act and deed in his said capacities and the free act and deed of Old Town Utility & Technology Park, LLC and of Relentless Capital Company, LLC.

Dated at ____________________________, Maine this ______ day of September, 2017.

_________________________________
Notary Public/Attorney-at-Law
Printed Name:_________________________
My Commission Expires:________________